# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DENNIS MELANCON, INC., ET AL.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 12-1337** |
| | * | **REF: ALL CASES** |
| | * | |
| **CITY OF NEW ORLEANS** | * | **SECTION "L"(1)** |

## ORDER & REASONS

Before the Court are a Motion for Declaratory Relief (Rec. Doc. No. 18), filed by Defendant City of New Orleans, and Motions for Preliminary Injunction (Rec. Doc. No. 31) filed by Plaintiffs. The Court, having reviewed the submitted memoranda and the applicable law and having heard testimony from a number of witnesses, is ready to rule. For the following reasons, the Defendant's Motion for Declaratory Relief is granted in part and denied in part, and Plaintiffs' Motion for Preliminary Injunction is granted in part and denied in part.

## I. BACKGROUND OF LITIGATION

This case consists of three separate lawsuits — *Dennis Melancon, Inc. et al. v. City of New Orleans*, *Monroe Coleman, et al v. City of New Orleans*, and *Cedric Richard, et al v. City of New Orleans* — consolidated under the name *Dennis Melancon, Inc. et al. v. City of New Orleans*. This dispute arises out of city ordinances affecting taxicabs passed by the New Orleans City Council on April 19, 2012. These ordinances target the following areas: Section 162-58 bans the use of law enforcement vehicles, vehicles previously used as taxis in other jurisdictions, and "salvaged," "reconditioned," or "rebuilt" vehicles as taxicabs;[1] Section 162-59 declares that driver's permits and Certificates of Public Necessity and Convenience ("CPNCs") "are privileges

---

[1]Orleans Parish, La., Code of Ordinances § 162-58.

1

and not rights";[2] Section 162-321 was amended to make transfers discretionary and to prohibit the transfer of a CPNC when a suspension or revocation is pending against a CPNC owner;[3] Section 162-380 was re-ordained to establish the standards for the inspection of for-hire vehicles;[4] Section 162-609 requires all taxicabs to maintain two years of trip sheets and other company records;[5] Section 162-657 requires taxicabs to have a taximeter with Passenger Information Monitor (PIM) device, which generates detailed printed receipts and prohibits the use of handwritten receipts;[6] Section 162-659 requires all taxicabs have credit/debit card acceptance machines;[7] Section 162-660 requires all taxicabs to be equipped with security systems;[8] Section 162-661 requires all taxicabs to be fitted with global positions systems (GPS);[9] and Section 162-613 places an age limit of eleven model years on vehicles used as taxicabs beginning August 1, 2012, and seven model years beginning January 1, 2014.[10]

The plaintiffs in each of the three consolidated suits, all owners or possessors of CPNCs, contest the validity and legality of these ordinances. The *Melancon* Plaintiffs filed suit in this Court against the City of New Orleans, alleging that several of these ordinances violate the takings clause of the Fifth Amendment of the United States Constitution, and seek a declaratory

---

[2]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-59.

[3]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-321.

[4]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-380.

[5]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-609.

[6]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-657.

[7]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-659.

[8]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-660.

[9]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-661.

[10]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-613.

judgment recognizing CPNCs as property rights and declaring Sections 162-59 and 162-321 of the Code of New Orleans unconstitutional and unenforceable. In the alternative, Plaintiffs seek damages as compensation for the loss of value of their CPNCs or as compensation for the amount required to comply with relevant sections of the Code of the City of New Orleans.

The *Coleman* Plaintiffs filed suit in the Civil District Court for Orleans Parish against the City of New Orleans. The *Coleman* Plaintiffs allege Fifth Amendment takings, but have also asserted claims for violation of the 14th Amendment Equal Protection Clause, invasion of privacy, unreasonable financial burden, and excessive government regulations.

The *Richard* Plaintiffs also filed suit in the Civil District Court for Orleans Parish against the City of New Orleans. The *Richard* Plaintiffs have asserted claims for Fifth Amendment takings, breach of contract, and Equal Protection Clause violations.

On July 20, 2012, the Civil District Court for Orleans Parish issued a Temporary Restraining Order in the *Coleman* case, preventing Defendant from enforcing the ordinances at issue for ten days. The CDC also scheduled a preliminary injunction hearing for July 30, 2012, when the TRO was due to expire. On July 23, 2012, however, Defendant removed the case to this Court. On July 27, 2012, Defendant filed a Motion for Declaratory Relief, seeking a declaration that the TRO ordered on July 20, 2012, would expire on July 30, 2012. This Court consolidated these cases and extended the TRO until Friday, August 3, 2012, and set a hearing on the motions for that date. On July 31, 2012, all parties agreed to continue the hearing until August 14, 2012, to allow them to conduct some limited discovery. The TRO was extended until the Court rules on the motions.

## II. HISTORY OF TAXICAB INDUSTRY

In order to fully understand the context of the ordinances at issue, it is helpful to first briefly review the history of the taxicab industry in this country. At the end of the 19th century,

automobiles began to appear on city streets throughout the country. It was not long before a number of these cars were hiring themselves out in competition with horse-drawn carriages. By 1899, there were nearly one hundred taxicabs on the streets of New York City. By the 1910s, New York had half a dozen large fleets, and thousands of independent owner/drivers.

As business grew, however, so did the need for enforceable regulations. The taxicab industry was plagued by problems, including unfair labor practices, price gouging, and unsafe conditions. In 1937, the mayor of New York City, Fiorello H. La Guardia signed the Haas Act, which introduced New York's first official taxi licenses and the medallion system that remains in place today. Medallions are small plates attached to the hood of a taxi, certifying it for passenger pick-up. By providing a limited number of medallions, the government could keep a closer watch on the quality of the taxicabs in the city. Over the ensuing decades, medallion-type regulatory systems were introduced in cities across the country.

In New Orleans, there has been an operating taxicab industry within the city limits for over one hundred years. During the 1950s, the City took steps to codify its practices and create a regulatory framework within which the taxis could operate. These regulations are set forth in the Orleans Parish Code of Ordinances (the "Municipal Code") at Chapter 162, "Vehicles for Hire," sections one through 1669. Section 162-181, passed in 1956, created the requirement that a vehicle must be registered to a CPNC in order to operate it as a taxicab, and, until April 23, 2009, section 162-186 limited the number of CPNCs to be issued to 1600. As a result, since the 1950s, owners of CPNCs have traded, alienated, conveyed, encumbered, mortgaged, and liened their interest in CPNCs.

On the state level, the Public Passenger Motor Vehicle Responsibility Law (LA. REV. STAT. ANN. § 45:200.1, *et seq.*) was enacted by the Louisiana legislature in 1962. According to the statute, the findings and declaration of policy by the legislature recognized that there had

4

been a substantial increase in the number of public carrier vehicles (defined as motor vehicles seating less than ten passengers and used to transport passengers for hire over any streets by a route or to a destination controlled by the passenger), and that there had been a consequent increase in the hazards from which the general public needed to be protected. The legislature further found that it was "imperative that effective, uniform, reasonable, and just supervision, regulation, and control be exercised over the operation of such vehicles . . . ." LA. REV. STAT. ANN. § 45:200.1 (1962).

In 1984, the Louisiana state legislature also passed Act No. 518, which addressed "[r]egulation by municipalities or other local governing authorities of private for hire vehicles, however propelled, providing passenger transportation services." The statute contains provisions that empower a municipality to regulate various aspects of the taxicab industry, including the entry into the business of providing taxicab service and "[a]ny other requirement adopted to ensure safe and reliable passenger transportation service even if it is anticompetitive in effect." LA. REV. STAT. 33:4792 (1984).

On April 19, 2012, the New Orleans City Council passed the above-described series of ordinances that are at issue in this case. The ordinances add new regulations and amend certain ordinances already in force. The ordinances raise the issue of whether the regulations are consistent with the authority created by the Public Passenger Motor Vehicle Responsibility Law and Act No.518, and whether they are allowable as a legal exercise of the City's inherent police power, or whether they overstep these boundaries such that federal and state laws or constitutions have been violated.

## III. PRESENT MOTION: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In the *Coleman* case, the TRO granted by the state court has been allowed to remain in effect after the case was removed to this Court. On July 27, 2012, Defendant City of New

Orleans filed a Motion for Declaratory Relief, asking the Court to dissolve the TRO pursuant to Federal Rule of Civil Procedure 65(b)(4). The Court reasoned that a hearing on the TRO would be functionally the same as a hearing on a motion for preliminary injunction, and set a hearing on the issue for August 14, 2012. On August 13, 2012, Plaintiffs filed a formal Motion for Preliminary Injunction (Rec. Doc. No. 31), and both Plaintiffs and Defendants filed pretrial memoranda (Rec. Doc. Nos. 30, 35). The Court heard testimony during a two-day hearing beginning on August 14, 2012, and ending on August 15, 2012. The Court now issues the following ruling.

## IV. LAW AND ANALYSIS

### A.    Required Showing for Preliminary Injunction

A preliminary injunction is an extraordinary remedy that is issued only when a party does not have an adequate remedy at law.  A preliminary injunction may be issued by this Court under Rule 65 if the plaintiff establishes four criteria: 1) irreparable injury, 2) substantial likelihood of success on the merits, 3) a favorable balance of hardships (equity), and 4) no adverse effect on the public interest.  *See Black Fire Fighters Ass'n v. Dallas*, 905 F.2d 63, 65 (5th Cir. 1990). Generally, a movant must satisfy *each* of the four criteria in order to be entitled to a preliminary injunction. *Id.*

The regulations at issue may generally be divided into two groups: (1) the ordinances declaring CPNCs to be privileges and making their transfer discretionary, and (2) the ordinances requiring certain upgrades and setting maximum vehicle age limits.[11] The Court will analyze the motion for preliminary injunction with respect to each of these two groups in turn.

### B.    CPNCs as "Privileges" and Restrictions on their Transfer

_____

[11]The *Melancon* Plaintiffs, for example, have divided their claims into these two categories.

In this category, the Court groups the following ordinances: Section 162-59 (declaring that CPNCs are privileges, rather than rights), and the amended Section 162-321 (making transfers discretionary and prohibiting the transfer of a CPNC when a suspension or revocation is pending against a CPNC owner). The Plaintiffs submit that all four criteria have been satisfied, and that they are entitled to a preliminary injunction. The Defendant denies this assertion.

1.        **Substantial Likelihood of Success**

The various Plaintiffs have asserted two claims regarding the Defendant's ordinances affecting their CPNCs. Plaintiffs have filed claims alleging: (a) an unconstitutional taking; and (b) that the regulations are an unconstitutional enactment of laws that are *ex post facto* and that interfere with the contract between the government and Plaintiffs. The Court will analyze each in turn as to their likelihood of success.

**a. Unconstitutional taking**

In order to evaluate Plaintiffs' likelihood of success on their unconstitutional taking claim, the Court must first decide whether Plaintiffs have a protectable property right in their CPNCs, and then determine whether Plaintiffs have presented a plausible claim for either a *per se* or a regulatory taking.

**i. Protectable property right**

In order to determine whether a taking has occurred, a court must first ascertain whether a claimant has alleged a property right that is protected by the Fifth Amendment; if no property right exists, the taking claim fails. *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002). In this case, Defendant cites the Louisiana Supreme Court opinion in *Hutton v. City of Baton Rouge*, 47 So. 2d 665, 666 (La. 1950), in support of its position that CPNCs are privileges rather

than rights.[12]

In *Hutton*, a bus driver applied for a CPNC to operate his business within the Baton Rouge city limits, and was denied. The plaintiff then brought an action for mandamus against the City of Baton Rouge, arguing that he had a protected property right in the CPNC, and demanding that he be issued one. The trial court dismissed the plaintiff's claim, and the Louisiana Supreme Court affirmed that decision, reasoning that plaintiff was not entitled to the relief sought because the CPNC at issue is "in the nature of a personal privilege or license," rather than a right. *Id.* at 668.

The *Hutton* decision would appear to be the simple answer to the question before the Court, however, the opinion interpreted the City of Baton Rouge municipal code related to bus CPNCs, not a Louisiana state law. The City of New Orleans created its own CPNC regulations in Chapter 162, and the *Hutton* opinion's interpretation of CPNCs in Baton Rouge does not address the City of New Orleans' particular system. Furthermore, as Plaintiffs point out, the regulatory system in Baton Rouge is not a direct analogue to the system in place in New Orleans. Although the City of Baton Rouge requires a CPNC to operate a bus line within Baton Rouge, one must acquire a franchise as well. Indeed, the court in *Hutton* explained that because plaintiff did not have a city franchise, even if the court compelled the city to issue a CPNC, the plaintiff would not have been entitled to operate his bus. In describing the difference between a privilege and a franchise, the court stated,

> "a franchise to use the streets in its usual sense is the right to use or
> occupy the streets for a stated period of time, for which a valuable

---

[12]Defendant also cites the Louisiana Supreme Court opinion in *AAA Cooper Transportation v. Louisiana Public Service Commission*, 623 So.2d 1262 (La. 1993), in support of its contention that CPNCs are privileges rather than rights. This opinion, however, lacks a discussion of the issue, instead simply citing *Hutton* as well as two non-binding cases from Delaware and Michigan. As a result, the Court will focus on the *Hutton* opinion.

consideration is paid, and contemplates a contract between the
municipality and the individual to whom granted, and vests in the holder
thereof a limited property right to use the public streets."

*Id.* at 668-69. Plaintiffs assert that New Orleans does not place such dual requirements on its cab

drivers. In New Orleans, the CPNC, alone, allows access or use of the streets as a taxicab. The

Municipal Code section requiring CPNCs uses similar language to the *Hutton* court's description

of a franchise to describe a CPNC in New Orleans ("No person shall own and operate or permit

any other person to operate . . . a taxicab . . . offered for hire and engaged in the business of

transporting passengers for hire *on the streets of the city* . . . ." ORLEANS PARISH, LA., CODE OF

ORDINANCES § 162-151 (emphasis added)). In addition, the Louisiana First Circuit case,

*Washington-St. Tammany Elec. Co-op, Inc. v. St. Tammany Parish Police Jury*, 612 So.2d 773,

777 (La. App. 1 Cir. 1992), contained a discussion of the difference between franchises and

licenses. The court stated,

"A license is usually a personal privilege granted for the purpose
of regulation, and is less extensive in duration and incidents than a
franchise . . . A grant by the government which is neither personal
nor for a temporary purpose, but which clothes the grantee with
rights and privileges not held by citizens generally, will be deemed
a franchise and not a license."

*Id*. at 777 (internal citations omitted). Plaintiffs contend that because they have had the ability to

transfer, encumber, and alienate their CPNCs, they are not "personal." Plaintiffs also allege that,

although they are required to renew their CPNCs every year, the process has always been merely

a formality, and therefore the CPNCs are not granted for a "temporary purpose." Accordingly,

Plaintiffs argue, New Orleans CPNCs are more analogous to Baton Rouge's franchises, and are

therefore a protected property right rather than a privilege.

With respect to this issue, the evidence produced shows that the characteristics of CPNCs

in New Orleans tend to fall more into the "franchise" than the "license" category, as those terms

are described by the *Hutton* and *Washington-St. Tammany Elec. Co-op* courts. Although the annual renewal process at first blush does lend the CPNCs a degree of temporariness, the evidence supports the conclusion that this process is only perfunctory and has been so for the past 60 years. Furthermore, CPNCs are limited in number and not "held by citizens generally," and when a CPNC is transferred from one person to another, the City of New Orleans issues a "Change of Ownership" certificate. Pls' Ex. 15. These are all property attributes not applicable to licenses.

To test this conclusion, the Court looks to the historic benefits of CPNCs. As related above, since the codification of the taxicab regulations in the 1950s, taxicab drivers have been able to sell, encumber, lease, and alienate their CPNCs, benefits central to property rights owners, but not license holders. On April 19, 2012, the City Council announced a change in the nature of CPNCs. Chapter 162-59, for the first time, states that a CPNC is a privilege rather than a right. Nevertheless, as the Chief Justice of the United States Supreme Court recently demonstrated in the opinion upholding the individual mandate of the Affordable Care Act as a tax, *see National Federation of Independent Business v. Sebelius*, 132 S. Ct. 1958 (2012), the fact that a legislature calls a CPNC a privilege does not necessarily make it so. In other words, if a government's grant to a citizen has demonstrated characteristics inherent to a property right, such as the ability to transfer, encumber, lease, or sell, for nearly sixty years, it may not convert it to a privilege by simply characterizing it as such.

The Northern District of Illinois reached a similar conclusion in *Flower Cab Company v. Petitte*, 658 F.Supp 1170 (N.D. Ill. 1987). In *Flower Cab Company*, the plaintiffs, Chicago taxicab companies, contested an ordinance prohibiting the sale, transfer, or assignment of the taxicab licenses. *See id.* at 1175. The City argued that the fact that Illinois law characterized a taxicab license as a personal privilege precluded a finding that the taxicab licenses were

protectable property interests. The court, however, disagreed. After finding that "[t]he ordinance provides that the license holder is the exclusive owner of the license, that he may assign it with few qualifications, and that he is entitled to renewal of the license absent revocation or suspension," the court held that these characteristics demonstrated that the licenses were "securely and durably" the licensees'. Therefore, the court rejected the city's argument that the law's characterization of the license as a privilege was dispositive, and found that the plaintiffs had a protectable property interest in the licenses.

In New Orleans, the city has long recognized CPNC owners' ability to sell, encumber, and bequeath their interests. In the city's application to transfer a CPNC, the current owner is instructed to list all persons with an "equitable interest" in the CPNC, including any beneficiary in the case of the CPNC owner's death or divorce. Pls.' Ex. 16, at 6. Yolanda Brownfield, the office manager of the New Orleans Ground Transportation Bureau, testified that she was aware of a situation in which a CPNC was a part of a divorce action, and that she had transferred CPNCs to heirs after receiving judgments of possession identifying a new owner. Furthermore, Ms. Brownfield stated that she was aware of CPNCs being used as collateral for Small Business Association loans. The ability to alienate or encumber is central to the concept of a property right. Therefore, the Court finds that the evidence supports the conclusion that Plaintiffs have a protectable property interest in CPNCs, for the purposes of this analysis. The Court will now determine whether an unconstitutional taking has occurred.

### ii. Per se/regulatory takings

Takings, as prohibited by the Fifth Amendment, have been divided into two categories: *per se* and regulatory. On one hand, uncompensated *per se* takings are prohibited by the plain language of the Fifth Amendment. *See* U.S. CONST. amend V ("[N]or shall private property be taken for public use, without just compensation."). These governmental actions involving

condemnations and physical invasions have a long legal history and generally require the straightforward application of *per se* rules. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002).

Regulatory takings jurisprudence, on the other hand, is a relatively recent development with no comparable reference in the text of the Constitution. *Id.* It is characterized by "'essentially ad hoc, factual inquiries' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Id.* (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), and *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)). In *Penn Central*, the seminal case on this issue, the Supreme Court created a multi-factor test to determine whether a regulatory taking has occurred. According to the *Penn Central* framework, courts should consider three factors: (1) the character of the governmental action, (2) the economic impact on the claimant, and (3) the extent to which the regulation has interfered with the property owner's reasonable investment backed expectations. *Id.* at 124-25.

In the instant case, Plaintiffs allege that the ordinances passed by Defendant amount to a deprivation of the Plaintiffs' property rights in their CPNCs. Plaintiffs do not allege that the City of New Orleans has either physically invaded or condemned their property. Therefore, the Court finds that Plaintiffs have not presented a prima facie case for a *per se* taking. The Court will next analyze whether there has been a regulatory taking using the *Penn Central* test.

Regarding the first *Penn Central* factor, the character of the government action, Defendant again asserts that the regulations at issue were enacted in order to promote the health, safety, and welfare of the community. Although the Court recognizes the validity of these goals with respect to the required taxi upgrades, as described below, this justification does not appear to be applicable here. There is no evidence indicating that declaring CPNCs to be privileges promotes the health, safety, and welfare of the community. Nor does Defendant explain how

placing the issuance and transfer of CPNCs at the sole and complete discretion of the Director of Safety and Permits promote health, safety, or welfare. Chapter 162 already contains lengthy prerequisites – including detailed application, background check, and drug test – for a person who seeks to receive a CPNC. If applicants are already denied CPNCs for failing to pass these prerequisites, it is unclear how allowing the Director to exercise his or her discretion is even necessary to protect the public interest. Indeed, it may have an adverse effect.

With respect to the second *Penn Central* factor, the economic impact on the claimant, Plaintiffs argue that the restrictions on transfer of CPNCs have greatly diminished their value. Plaintiffs assert that, historically, taxicab drivers have been considered high credit risks and so have utilized the equity value of the CPNC in order to finance a vehicle or make required upgrades. Plaintiffs argue, and the testimony of Joseph Lange supports the assertion, that with the passing of the ordinances at issue, the City has reduced the property value of the CPNC to zero. Furthermore, Plaintiffs allege the City has demonstrated that even the actions of a driver leasing a CPNC from an owner can be imputed to the CPNC owner to justify revocation. As a result, it is unlikely that a typical financing agency will now take on the risk of accepting a CPNC as leverage. Plaintiffs assert that they will no longer be able finance new vehicles or make any required upgrades.

In response, Defendant cites the Supreme Court for its holding that "[a] reduction in economic benefits, even to the extent where the government regulations prevent the most profitable use of a claimant's property, does not constitute a taking." *Andrus v. Allard*, 444 U.S. 51, 66 (1979). It is unclear in whose favor the second factor falls. Plaintiffs have presented evidence of severe economic impact as a result of the restriction on transfer of CPNCs. For example, the only lender to taxicabs in the city, Mr. Lange, testified that he is now unable to assume the risk of providing financial assistance to CPNC owners when Sections 162-59 and

162-321 declare CPNCs to be licenses and make their transfer dependant on the sole discretion of the Director of Taxicab Bureau. Mr. Lange further testified that if he is unable to continue providing financial assistance to CPNC owners, he believes that they will be unable to maintain their businesses as well. This evidence was not refuted by the City. According to Defendant, however, this is not enough to constitute a taking, because Plaintiffs still retain the economic benefit from day-to-day use of the CPNC.

The *Andrus* holding is not as clear as the Defendant believes. In *Andrus*, the plaintiffs challenged two federal statutes that prohibited commercial transaction in parts of birds legally killed before the passage of the Eagle Protection Act and the Migratory Bird Treaty Act. The plaintiffs attempted to sell two Indian artifacts partially composed of feathers of protected birds, and challenged the constitutionality of the statutory provisions limiting transfer. The Supreme Court held that the statutory provisions did not constitute an unconstitutional taking, and upheld the Acts. In explaining its holding, the Court stated that "[a]t least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety . . . . It is crucial that appellees retain rights to possess and transport their property, and to donate or devise the protected birds." *Id.* at 65-66.

In the instant case, Defendant has not only destroyed one "strand" of the Plaintiffs' property right, it has enacted an ordinance proclaiming that Plaintiffs retain no property rights at all -- that, in fact, Plaintiffs hold a mere license. Indeed, the *Andrus* court's statement that a "reduction in economic benefits" is allowable does not apply to a case in which the government's action would revoke all property interest that Plaintiffs have in the CPNCs and destroy all of the CPNC's economic value.

Finally, regarding the third *Penn Central* factor, the extent to which the regulation has interfered with the property owner's reasonable investment-backed expectations, Plaintiffs argue

that CPNC owners invest heavily in their businesses, and some use the CPNC as a sort of 401(k), selling it at the end of their careers in order to help fund their non-working years. Plaintiffs contend that Defendant's ordaining that a CPNC is no longer a property right effectively destroys the value of their investment. Defendant, on the other hand, relies on the holding of *Forest Properties, Inc. v. United States*, that a takings plaintiff in a highly regulated industry lacks a reasonable investment-backed expectation. *Forest Properties, Inc.*, 39 Fed. Cl. 56, 76 (Fed. Cl. 1997).

Defendant, however, mischaracterizes the *Forest Properties* holding. In discussing the investment-backed expectation requirement, the opinion stated that "[a] regulatory scheme affecting the property at issue at the time of purchase *can* significantly discount an owner's investment-backed expectations with respect to their property." *Id.* (emphasis added). The court went on to note that "numerous courts" had found that regulatory structures had entirely removed an owner's investment-backed expectations. The *Forest Properties* opinion did not state that plaintiffs in highly regulated industries will always lack reasonable investment-backed expectations. Instead, the opinion recognized that courts have come to various conclusions on a case-by-case basis after reviewing the facts particular to each case. That method is how the Court will proceed in the instant case.

After reviewing the evidence, the Court concludes that Plaintiffs' investment-backed expectations are severely diminished, if not abrogated entirely. As a result of the regulations at issue, Plaintiffs are losing their property interests in what is often their only investment that has any value. Compared to a CPNC, the other large investment that taxicab drivers make in their vehicles is relatively small and, unlike their CPNC, decreases in value over time. Similarly, taxicab companies that own CPNCs would lose a large part of their capital if CPNCs were no longer considered property. Both taxicab drivers and companies have invested a significant part

of their life as well as large amounts of money in CPNCs, and, for decades, have been allowed to expect a future return on such investments. Mr. Lange testified that due to the regulations, he is unable to enter contracts to provide financial assistance to taxicab drivers. Mr. Lange stated that if he is unable to maintain his business, he expects that taxicab owners will be unable to maintain theirs as well. Mr. Lange is the only lender of the type in the city. With Defendant's ordinances declaring CPNCs to be "privileges" and making their transfer discretionary, an entire industry has been gutted of a large amount of its capital and deprived of a means of funding needed upgrades. As a result, it appears that Defendant's regulations have interfered significantly with the reasonable investment-backed expectations of Plaintiffs.

In sum, the facts and evidence on the record supports the conclusion that Plaintiffs have a substantial likelihood of success on their unconstitutional taking claim with respect to the ordinances declaring CPNCs to the privileges and making their issuance and transfer discretionary.

### b. *Ex post facto* laws violation of the Contracts Clause

The *Richard* Plaintiffs allege that the passage of the new ordinances, "by breaching the contract between the governments (state and city) and plaintiffs, amounts to an unconstitutional enactment of laws that are *ex post facto* and that interfere with such contracts." Citing *Russell v. Sebastian*, 233 U.S. 195 (1911), Plaintiffs assert that the statutory scheme created by the State of Louisiana and the City of New Orleans, including 45:200.1, constituted an offer to enter into the taxicab business subject to clearly understood conditions. In addition, Plaintiffs allege that the purchase of CPNCs by each of the Plaintiffs and their predecessors in title, along with their subsequent operation of their CPNCs and vehicles, constituted an acceptance of that offer that together formed a contract. According to Plaintiffs, the regulations at issue breach that contract, and Defendant is liable for the resulting damages.

In *Russell v. Sebastian*, the Supreme Court considered a provision of the California State Constitution of 1879, as amended in 1885, which gave "any individual or any company duly incorporated for such purpose . . . the privilege of using the public streets and thoroughfares [of certain municipalities] and of laying down pipes . . . and connections . . . as may be necessary for . . . supplying such city . . . with gaslight . . . or with fresh water . . . ." *Sebastian*, 233 U.S. at 198. In 1911, that section was amended to provide, in pertinent part, that "[p]ersons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law . . . ." *Sebastian*, 233 U.S. at 198-99. The Court held that there could be no dispute "[t]hat the grant, resulting from an acceptance of the state's offer, constituted a contract, and vested in the accepting individual or corporation a property right, protected by the Federal Constitution," and concluded that "the constitutional amendment of 1911, and the municipal ordinances adopted in pursuance thereof, were ineffectual to impair this right . . . ." *Sebastian*, 233 U.S. at 204, 210.

The principle of law explained in *Sebastian* continues today. *See, e.g.*, *Phelps Dodge Corp. v. Arizona Elec. Power Co-op., Inc.*, 83 P.3d 573, 579 (Ariz. App. Div. 1 Jan. 27, 2004). The opinion should not, however, be taken as a broad holding that every piece of legislation allowing action by a person or corporation is an offer from which a binding contract may be formed. In the instant case, unlike in *Sebastian*, there has been no absolute grant of terms related to the taxicab industry that may be construed as an offer. In fact, Section 200.1, the only statute that Plaintiffs specifically cite in their contracts claim, asserts that it is "imperative" that "effective, uniform, reasonable, and just supervision, regulation and control" be exercised over the taxicab industry. LA. REV. STAT. ANN. § 200.1. The section goes on to mandate that the legislation allowing regulation of taxicabs "should be construed liberally and enforced strictly in

favor of the public." *Id.* Furthermore, unlike in *Sebastian*, when the state made an offer while seeking private involvement in a public service for the benefit of the citizens, the State of Louisiana passed Section 200.1 in order to ensure order and safety in the already-existing taxicab industry. Finally, the precedent set by *Sebastian* has been applied almost exclusively in the area of public utilities. *See, e.g.*, *Callais Cablevision v. Houma Cablevision, Inc.*, 451 So.2d 6, 9 (La. App. 1 Cir. Mar. 3, 1984) (cable); *Pacific Tel. & Tel. Co. v. City of Los Angeles*, 270 P.2d 903, 914 (Cal. App. 2 Dist. May 25, 1954) (telephones); *Traverse City v. Consumers Power Co.*, 64 N.W. 2d 894, 900 (Mich. 1954) (electricity). In all of the cases in which cities have enacted legislation requiring upgrades to taxicabs, no court has held the laws unconstitutional based on the Contracts Clause. *See, e.g.*, *Alexandre v. New York City Taxi and Limousine Commission*, 2007 WL 2826952 (S.D.N.Y. September 28, 2007) (upholding New York City's regulations requiring credit/debit, text messaging for emergencies, automatic trip data collection, GPS).

In summary, neither the state nor the city made an offer to the taxicab industry that could have been accepted to form a binding contract. Therefore, it does not appear that Plaintiffs have a substantial likelihood of success on this breach of contract claim.

### 2.      Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm if the regulations declaring CPNCs to be privileges and restricting their transfer are enforced. According to Plaintiffs, these ordinances deprive them of their Fifth Amendment property rights.

Defendant, on the other hand, argues that Plaintiffs will not suffer any actual injury if these ordinances are enforced. Defendant asserts that the ordinance declaring that CPNCs are privileges rather than rights has been accepted since at least April 25, 2012. In support of this view the Defendant notes that Plaintiffs Coleman and Lange, in their depositions, stated that their lease agreements and payments have not changed since April. As a result, Defendant

contends that this demonstrates that Plaintiffs would not be affected by the enforcement of the ordinances, and will therefore suffer little harm if the regulations continue to be enforced in the future.

When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347 (1976) (finding irreparable injury shown when a plaintiffs' First Amendments rights were threatened or impaired); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) (finding per se irreparable injury in United States Navy's alleged violation of the Establishment Clause); *Doe v. Mundy*, 514 F.2d 1179 (7th Cir. 1975) (finding per se irreparable injury in an alleged deprivation of plaintiffs' fundamental privacy right). In this case, Plaintiffs allege that the ordinances declaring CPNCs to be privileges and making their transfer discretionary are a violation of their Fifth Amendment rights to property. Because the Court finds that Sections 162-59 and 162-321 deprive the Plaintiffs of their property rights and are, therefore, *per se* irreparable harm.

### 3.        Favorable Balance of Hardships

Plaintiffs argue that if the regulations declaring that CPNCs are privileges and restricting their transfer are enforced, they will suffer substantial harm, while Defendant will suffer little harm if the preliminary injunction is granted. According to Plaintiffs, these regulations not only jeopardize their ability to procure financing and new vehicles, but also potentially prevent some taxicab drivers from exiting the business with any funding for their retirement. Defendants, on the other hand, assert that the regulations at issue have been in force since their passage, in April of this year. In addition, Defendants note that Plaintiffs Coleman and Lange, in their depositions, stated that their lease agreements and payments have not changed since April. As a result, Defendant contends that Plaintiffs will suffer little harm if the regulations are enforced during

the litigation.

From the evidence and testimony provided, it appears that Plaintiffs would suffer more severe hardship if the preliminary injunction were denied as to the ordinances at issue than Defendants would suffer if it were granted. Mr. Lange testified on the record that, as a result of Section 162-59, he is unable to consider entering into any additional lease-purchase agreements (the funding mechanism) for CPNCs. According to Mr. Lange, Section 162-59 has rendered a CPNC valueless on the market. Furthermore, as mentioned above, he testified that because his business is the only one he is aware of that provides financial assistance to CPNC owners, if his business closes down, many CPNC owners will be unable to continue their businesses.

Defendants, on the other hand, have not provided evidence of any harm they will suffer if the regulations declaring that CPNCs are privileges and restricting their transfer are enjoined. As a result, the Court finds that the Plaintiffs have established that the balance of hardships weighs in their favor.

### 4.        Lack of Adverse Effect on the Public Interest

Plaintiffs argue that the regulations at issue will have a substantial adverse effect on the public interest. Plaintiffs assert that these regulations put the status of their CPNCs in question and jeopardize their ability to finance the required upgrades. If Plaintiffs do not comply with the upgrade requirements, they will be unable to operate their taxicabs, and the public will be denied the usual fleet of taxis servicing New Orleans. Defendants have not made an argument related to the effect of the CPNC regulations on the public.

The Court finds that it does not appear that a preliminary injunction would have an adverse effect on the public. In fact, here, the opposite is true; a preliminary injunction would have a beneficial effect. It would allow CPNC owners a mechanism to finance the upgrades called for by the City.

As discussed above in the unconstitutional takings claim analysis, it is not clear how the Defendant's regulations in this area promote the health and safety of the public. In fact, it is unclear what effect these regulations would have on the public at all. Therefore, the Court concludes that a preliminary injunction would not have an adverse effect on the public interest.

**5.**        **Summary**

In sum, Plaintiffs have established the four criteria necessary for the grant of a preliminary injunction regarding the nature and status of the CPNCs, and the provision making their transfer discretionary. Accordingly, the Court grants the Plaintiffs' Motion for Preliminary Injunction and enjoins the enforcement of Sections 162-59 and 162-321, and denies Defendant's Motion for Declaratory Relief, with respect to Sections 162-59 and 162-321 of the Municipal Code of New Orleans.

**C.**        **Taxicab Upgrade Ordinances**

The upgrade ordinances present a different issue than the ordinances dealing with CPNCs. In this category, the Court groups the following ordinances: Section 162-58 (declaring that certain vehicles may not be used as taxicabs), Section 162-380 (establishing the vehicle inspection standards), Section 162-609 (requiring all taxicabs to maintain two years of trip sheets and other company records), Section 162-657 (requiring taxicabs to have a taximeter with PIM), Section 162-659 (requiring all taxicabs to have credit/debit card acceptance machines), Section 162-660 (requiring all taxicabs to be equipped with security systems), Section 162-661 (requiring all taxicabs to be fitted with GPS), and Section 162-613 (placing certain age limits on vehicles used as taxicabs). These ordinances focus on the appearance, efficiency, convenience, and safety of taxicabs.

**1.**        **Irreparable Injury**

Plaintiffs argue that if no preliminary injunction is granted, they will be irreparably

injured due to the high cost of complying with Defendant's ordinances that require significant upgrades to taxicabs. Plaintiffs presented testimony that compliance will cost each CPNC owner $25,000 to $40,000 per vehicle. Plaintiffs argue that as a result of Section 162-59, which declares that CPNCs are privileges rather than rights, no reputable financing organization will lend them money to use to pay for the cost of the required upgrades. As a result, Plaintiffs allege, taxicab drivers must choose between procuring financing through some other, possibly dangerous, means in order to comply with the required upgrades, or not operating their businesses while the ordinances are in force. The city, on the other hand, has produced evidence indicating that the cost of the upgrades is closer to $2,000, and not the amounts suggested by Plaintiffs.

Whether or not Plaintiffs' costs in complying with the regulations are significant, Plaintiffs have not demonstrated that their injuries will be irreparable. In *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981), the Fifth Circuit explained that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.* at 338; *see also Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981); *Parker v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). The Fifth Circuit's opinion in *Deerfield* provided examples of irreparable injuries, such as loss of First Amendment rights and invasion of privacy.[13] In *Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975), the Fifth Circuit further explained that "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* at 240.

---

[13]Plaintiffs have asserted an invasion of privacy claim, however, as discussed below, they do not appear to have a substantial likelihood of success on it.

In this case, Plaintiffs argue that if the Court does not institute a preliminary injunction, they will be forced to spend thousands of dollars on new vehicles and equipment upgrades, possibly without the ability to finance the transactions with their CPNCs. The Court in this opinion has concluded that CPNCs are property. Thus CPNC owners have a mechanism to finance these upgrades. Even if the Plaintiffs' cost estimate is accurate, the fact that the costs of the upgrades may be high is not alone sufficient to create an irreparable injury. The Fifth Circuit has held that some degree of financial harm does not constitute an irreparable injury because plaintiffs have recourse to recover the amounts expended in subsequent civil suits. As a result, Plaintiffs have not shown "irreparable injury" for the purposes of this analysis.[14]

**2.          Substantial Likelihood of Success**

The various Plaintiffs have asserted multiple claims regarding the Defendant's taxicab upgrade ordinances. Altogether, the Plaintiffs have filed claims alleging: (a) an unconstitutional taking; (b) violation of the 14th Amendment Equal Protection Clause; (c) invasion of privacy; (d) unreasonable financial burden; (e) excessive government regulations; (f) violation of the Contracts Clause and Louisiana Revised Statute § 45:200.1. Because the Court concluded that no contract had been formed, and that § 45:200.1 has not been violated, it will not repeat its analysis here. The remainder of the claims will be discussed in turn.

To summarize, it appears that Plaintiffs do not have a substantial likelihood of success on any of their claims related to the required taxicab upgrades. The Court will address each claim's likelihood of success, in more detail, in turn.

**a. Unconstitutional taking**

---

[14]Because all four criteria must be met for a court to grant a preliminary injunction, the Court need not analyze the three remaining factors. Nevertheless, the Court will continue its analysis for the record.

As established above, the Court has determined that Plaintiffs have a protectable property interest in their CPNCs, and that Plaintiffs have not presented a valid claim for a per se taking. Therefore, the Court will now turn to the *Penn Central* test to analyze the claim of an unconstitutional taking with respect to the required taxicab upgrade ordinances.

The first *Penn Central* factor, the character of the government action, weighs against the Court concluding that a taking has taken place. Defendant claims that the required taxicab upgrades were enacted in order to promote the health, safety, and welfare of the community. The testimony and evidence on the record support Defendant's assertion that taxicab riders would benefit from the ability to pay with credit or debit cards, the additional security provided by installed cameras, the improved service resulting from a GPS system, and the use of modern vehicles in the taxicab fleet. In addition, Defendant presented credible evidence that driving a taxicab is a very dangerous profession, and that the installation of cameras and the use of credit/debit cards will reduce the risk faced by taxicab drivers every day. Finally, the testimony of both Malachi Hull and Michelle Thomas established that the required upgrades support the welfare of the community because they place the city in better competition with other major cities for large conventions. Because New Orleans generates a substantial portion of income from the conventions held within its borders, it is in the city's interest to provide the same amenities as other major convention cities. For example, New York and Chicago have already implemented similar upgrade requirements, such as taxicabs with credit/debit card machines and GPS devices. Accordingly, the Court finds that the evidence indicates that the City undertook the action at issue in order to promote the health, safety, and welfare of New Orleans residents, tourists, and taxicab drivers, and that it is within the City's power to enact these upgrade ordinances.

Regarding the second *Penn Central* factor, the economic impact on the claimant, both

sides present strong arguments. On one hand, Plaintiffs claim that the cost of compliance with the upgrades would be significant. They have presented evidence indicating that costs of these upgrades will be $17,000 to $40,000 per taxicab. On the other hand, Defendant has presented evidence indicating that the total costs of these upgrades to be closer to $2,000, a tolerable price when compared with the public good that comes from the regulations. Defendant cites the Fifth Circuit's statement that "some adverse effect on economic value will be tolerated in the interest of promoting the health, safety, welfare, or morals of a community." *Tex. Manufactured Hous. Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1106 (5th Cir. 1996). The court in *Texas Manufactured Housing Association*, went on to explain that the plaintiff in that case "fail[ed] to show . . . any diminution of the property's value." *Id.* Similarly, in this case, Plaintiffs have not shown that complying with the required upgrade regulations will diminish the value of their CPNCs or taxicab businesses. In fact, there was testimony that the upgrades will result in more people using taxicabs for transportation, thereby increasing the value of a CPNC as well as the revenue earned by the driver. The Court finds that although Plaintiffs have shown some potential economic impact, even if it did occur, it is outweighed by the interest in promoting the health, safety, and welfare of the community.

The third *Penn Central* factor, the extent to which the regulation has interfered with the property owner's reasonable investment backed expectations, tends to fall in Defendant's favor as well. In the instant case, Plaintiffs are taxicab drivers or owners in the City of New Orleans. The taxicab industry has been the subject of substantial state and municipal regulation since the 1950s, when Chapter 162 was first passed. Over the ensuing decades, the regulations pertaining to taxicab drivers have been expanded and amended, including the rules related to drivers'

dress[15] and fares,[16] and the addition of passengers' rights.[17] Therefore, Plaintiffs, participants in a highly regulated industry, reasonably should have expected that the value of their investments may be somewhat affected by further regulatory changes. And, as the Court of Federal Claims has held, "[a] takings plaintiff lacks a reasonable investment-backed expectation when the property at issue is subject to government control and regulation." *Forest Properties, Inc. v. United States*, 39 Fed. Cl. 56, 76 (1997). By participating in an industry that is subject to government control and change, a property owner reasonably should have expected that the value of the investment may be somewhat diminished by regulatory changes. *See Burns Harbor Fish Co., Inc. v. Ralston*, 800 F. Supp. 722, 726 (S.D. Ind. 1992).

In sum, an analysis of the *Penn Central* factors with respect to the taxicab upgrades reveals that although there will be some cost to the Plaintiffs, they have a financial mechanism for meeting it, and their costs are outweighed by the benefit that will be realized by the regulations. Therefore, the Court concludes that Plaintiffs do not have a substantial likelihood of success with respect to their unconstitutional takings claims regarding the required taxicab upgrades.

### b. Equal Protection Clause violation

Both the *Coleman* and the *Richard* Plaintiffs assert equal protection violations. The *Coleman* Plaintiffs assert that the maximum age limits on taxicabs serve no legitimate purpose and violate the Equal Protection Clause because the age requirements do not apply to limousines, shuttle buses, shuttle vans, tour buses, tour vans, and courtesy vans. The *Richard* Plaintiffs assert

---

[15]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-449.

[16]*See, e.g.*, ORLEANS PARISH, LA., CODE OF ORDINANCES §§ 162-741, 745, 747.

[17]ORLEANS PARISH, LA., CODE OF ORDINANCES § 162-455.

that the new ordinances requiring certain taxicab upgrades violate the Equal Protection Clause because they compel drivers to "unreasonably and unjustly expend funds for the purpose of acquiring new or newer vehicles and maintaining various equipment."

The Equal Protection Clause requires that all persons similarly situated be treated alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The general rule for testing official action on equal protection grounds focuses on three elements: (1) a classification, (2) the purpose of the classification, and (3) the fit between the classification and the purpose. *See Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997). When the regulation does not involve any discernable fundamental interest or affect with particularity any protected class, the test of constitutionality is whether the regulation has a rational relation to a legitimate state interest. *See Hester v. Rizzo*, 454 F. Supp. 537, 543 (E.D. La. 1978).

Plaintiffs do not argue, and it does not appear, that they are a part of any protected class. Therefore, their claims would be subject to rational basis review, which only requires that the regulation have some rational relationship to a valid state interest. The "rational relation" analysis was outlined in *City of New Orleans v. Dukes*, as follows:

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. *See, e. g., Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step-by-step, *Katzenbach v. Morgan*, 384 U.S. 641 (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.

> *See, e. g., Williamson v. Lee Optical Co.*, 348 U.S. 483, 488-89
> (1955). In short, the judiciary may not sit as a superlegislature to
> judge the wisdom or desirability of legislative policy
> determinations made in areas that neither affect fundamental rights
> nor proceed along suspect lines, *see, e.g., Day-Brite Lighting, Inc.*
> *v. Missouri*, 342 U.S. 421, 423 (1952), in the local economic
> sphere, it is only the invidious discrimination, the wholly arbitrary
> act, which cannot stand consistently with the Fourteenth
> Amendment. *See, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 732
> (1963).

427 U.S. 297, 303-04 (1976).

While the new taxicab regulations do not apply to limousines, shuttle busses, and the like, the unique nature of the taxicab business does seem to justify this distinction. For example, in *American V.I.P. Limousines, Inc. v. Dade County Board of County Commissioners*, the district court for the Southern District of Florida rejected the limousine business owners' equal protection claims that new regulations treated limousines and taxicabs unequally, recognizing that the taxicab business is "quite different" than the services provided by limousines. 757 F. Supp. 1382, 1395 (S.D. Fla. 1991). In essence, the taxicabs are "on demand" vehicles, while tour buses and limousines are "reservation only" vehicles.

Furthermore, the new regulations are rationally related to addressing the state's interest and duty in regulating the taxicab industry. Other courts have found that cities have a rational basis for implementing required upgrades to the taxicabs operating within their borders. For example, the district court for the Eastern District of Pennsylvania found that Philadelphia's regulations requiring all taxicabs to be equipped with a GPS tracking device promoted the public good "since it [was] pursuant to a state legislative act to promote hospitality and tourism in Philadelphia." *MCQ Enters, Inc. v. Phila. Parking Auth.*, 2007 WL 127728 at *1 (E.D. Pa. 1/11/2007).

In the instant case, Defendant has presented significant testimony and evidence

establishing a rational basis between the required taxicab upgrades and Defendant's interest in regulating its taxicab industry, ensuring the safety of its citizens and visitors, and promoting hospitality and tourism in New Orleans. Mr. Hull related Defendant's interest in the safety of taxicab riders and drivers to the ordinance setting maximum vehicle ages, testifying that newer vehicles tend to break down less often and have more standard safety features. Also, as noted above, the testimony of both Mr. Hull and Ms. Thomas established that the upgrade ordinances are related to Defendant's interest in promoting New Orleans as a destination for major conventions.

Mr. Hull further testified that the ordinances at issue were not applied to other for-hire vehicles for several reasons. First, Mr. Hull testified that the maximum vehicle age regulation was only applied to taxicabs because they are used more often, both in terms of frequency and mileage, than other for-hire vehicles. Second, Mr. Hull testified that other for-hire vehicles, such as shuttles and limousines, are not available on an on-demand basis. These other types of for-hire vehicles are generally reserved in advance, and riders often are able to pay with the credit card used for the reservation. According to Mr. Hull's testimony, taxicab drivers are more vulnerable because they mostly receive payment in cash. Requiring credit and debit card acceptance would make drivers less vulnerable to assault and theft and bring taxicabs in line with what other for-hire vehicles generally already do, as well as what other cities already do.

In sum, Plaintiff's equal protection claim is evaluated using rational basis review. Defendant has established a rational basis between the upgrade regulations and its interest in promoting the health, safety, and welfare of New Orleans, Therefore, Plaintiffs do not have a substantial likelihood of success on their equal protection claims.

### c. Invasion of privacy

The Constitution protects individuals against invasion of privacy by the government.

*Whalen v. Roe*, 429 U.S. 589, 598-602 (1977). The liberty interest in privacy encompasses two notions: the freedom from being required to disclose personal matters to the government, and the freedom to make certain decisions without government interference. *Id.* at 599-600. The government cannot inquire into matters in which it does not have a legitimate and proper concern. *Id.* at 600-02. But the U.S. Constitution is violated only by invasions of privacy involving the most intimate aspects of human affairs. *See Ramie v. City of Hedwig Village*, 765 F.2d 490, 492 (5th Cir. 1985). A plaintiff must demonstrate a reasonable expectation of privacy.

The United States Supreme Court has recognized that "[a]n expectation of privacy in commercial premises . . . is different from . . . a similar expectation in an individual's home. This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." *See New York v. Burger*, 482 U.S. 691, 699 (1987) (internal citations omitted). The Court continued, "Certain industries have such a history of governmental oversight that no reasonable expectation of privacy could exist." *Id.*

In the instant case, the *Coleman* and *Richard* Plaintiffs have asserted invasion of privacy claims. Plaintiffs argue that requiring them to install GPS devices, taximeters, credit/debit card machines, and security cameras violates their right to privacy and constitutes an illegal search and seizure of taxicab drivers. Privacy claims similar to these were rejected by the court in *Alexandre v. New York City Taxi and Limousine Commission*, 2007 WL 2826952 (S.D.N.Y. 9/28/2007). In that case, the plaintiffs argued that New York's regulation requiring a GPS in all taxicabs violated their right to privacy, but the court found that plaintiffs' claims were not likely to succeed because there is "no legitimate expectation of privacy." *Id.* at *9.

Like New York City, New Orleans has a highly regulated taxicab industry. Plaintiffs, taxicab drivers and CPNC owners, do not have a legitimate expectation of privacy on the commercial premises of their vehicles. Therefore, Plaintiffs do not have a substantial likelihood

of success with respect to their invasion of privacy claims related to the required upgrades.

### d. Unreasonable financial burden, excessive government regulation

The *Richard* Plaintiffs allege that they have "a constitutional right to pursue an honest living in their chosen occupation free from undue financial burdens and unreasonable governmental restrictions." The *Richard* Plaintiffs further allege that the "trip sheet requirement" created by Section 162-661 is unconstitutional because it is "completely unreasonable and impractical" to require fleets or companies to maintain two years of trip sheets for drivers who are not their employees. Plaintiffs have not cited, either in their Complaint or in their pre-trial memoranda, a specific provision of the Constitution, statute, or case as a basis for their claims. To the extent these allegations have been evaluated under the guise of another claim, such as the Fifth Amendment takings claim, the Court reiterates its conclusions. Otherwise, the Court finds that Plaintiffs have not asserted sufficient facts and allegations or produced sufficient evidence in support of these claims for the Court to find that Plaintiffs have a substantial likelihood of success.

### 3. Favorable Balance of Hardships

Plaintiffs argue that the potential harm they will suffer if the required upgrade regulations are enforced is substantial. As detailed above, Plaintiffs presented testimony that it could cost as much as $40,000 for each car to come into compliance with the ordinances. Furthermore, Plaintiffs argue that granting a preliminary injunction would cause only minimal harm to Defendant. Plaintiffs argue that Defendant will incur no additional cost if its ordinances are not enforced until the conclusion of litigation. Therefore, Plaintiffs argue, there will be a favorable balance of hardships if a preliminary injunction is granted.

The credible evidence, however, does not support Plaintiffs' contention. First of all, Defendant produced evidence that the cost to Plaintiffs would be much lower than they allege.

Mr. Hull testified that, after speaking with cab company owners and equipment retailers, he estimated that it will cost $2,011.95 per car to be in compliance with the regulations. Furthermore, Mr. Hull testified that because his department had planned a phase-in enforcement protocol, all taxicabs would not need to be in compliance the first day that the ordinances are enforced. As a result, many taxicab owners would have time to comparison shop or group together to buy in bulk in order to save on the equipment and installation costs.

Furthermore, contrary to Plaintiffs' assertion, Defendant will suffer some harm if the regulations are not enforced. Defendants have stated that they enacted the ordinances in 2012 so that the taxicab industry might be in full compliance prior to the busy festival season and the 2013 Superbowl, being held in New Orleans. If the preliminary injunction is granted, but the permanent injunction is later denied, Defendant may only have a short period of time to enforce the ordinances before the goal dates, an occurrence that could cost Defendant additional resources, both in terms of finances and employee hours.

**4.        Lack of Adverse Effect on the Public Interest**

Plaintiffs argue that if the Court grants the preliminary injunction enjoining the upgrades, there will be no adverse effect to the public interest. Plaintiffs point out that New Orleans currently has a functional taxicab industry, and that the public will not suffer if the status quo is maintained. In fact, Plaintiffs argue, the public will benefit from a preliminary injunction because no taxicabs will be forced out of commission due to inability to comply with the new ordinances.

Defendant contends that a preliminary injunction will cause significant harm to the public interest. Defendant alleges that it passed the upgrade ordinances in order to ensure the health and safety of residents and visitors in New Orleans. Furthermore, Defendant asserts that allowing New Orleans taxicabs to continue to lack features such as credit/debit card machines and GPS

systems effectively requires taxicab users in New Orleans to use low-quality, unreliable transportation and denies the City an ability to compete with other cities for conventions and special events. Moreover, Defendant argues that it planned to institute the ordinances on August 1, 2012, in order to ensure an upgraded taxicab fleet when the Superbowl takes place in New Orleans in early 2013.

The evidence supports the conclusion that there would be a significant adverse effect on the public if the preliminary injunction were granted as to the upgrade ordinances. The City of New Orleans has stated that its purpose in passing the upgrade regulations was to ensure the health and safety of citizens and visitors. The evidence presented supports the conclusion that taxicabs in New Orleans are currently dangerous for both drivers and riders: Mr. Hull testified that four New Orleans taxicab drivers have been murdered in the last 25 months, and that six sexual assaults of riders have occurred since 2010. Mr. Hull testified that in cities with the types of upgrades mandated by the ordinances at issue, these rates are significantly lower.

Furthermore, the Court finds that regulations that require newer vehicles have a direct effect on the public welfare. Section 162-613, which places an age limit on vehicles used as taxicabs, Section162- 58, which limits the types of vehicles that may be used as taxicabs, and Section 162-380, which establishes taxicab inspection standards, ensure that taxicabs in New Orleans are in working order and are more likely to have advanced safety features, to the benefit of the public.[18] Although Plaintiffs argue that the status quo would be satisfactory, the evidence supports the conclusion that the Defendant performed significant research into the practices of

---

[18]Plaintiffs argued that a taxicab's mileage and condition, rather than its model year, are better indicators of vehicle quality with respect to safety and passenger comfort. While this may be true, the choice of measurements is the city's decision as the lawmaking body. Furthermore, the city's chosen method has the advantage of simple enforcement, rather than creating a gray area in which one person must determine when a vehicle's condition has deteriorated to the point that it should be permanently removed from service.

other cities and the taxicab industry's "best practices" related to safety regulations.[19] The Court finds that this research shows that the current state and condition of the taxicabs is, in fact, detrimental to the public safety and welfare. Therefore, the Court concludes that granting the preliminary injunction as to the upgrade ordinances would have an adverse effect on the public interest.

### 5.        Summary

In sum, Plaintiffs have not established that the four criteria necessary for a court to grant a preliminary injunction enjoining the upgrade ordinances have been met. Accordingly, the Court denies Plaintiff's Motion for Preliminary injunction as to the upgrade ordinances, and grants Defendant's Motion for Declaratory Relief as to the upgrade ordinances.

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's Motion for Declaratory Relief (Rec. Doc. No. 18) is hereby **GRANTED IN PART AND DENIED IN PART**, as set forth above. The Court hereby grants a preliminary injunction enjoining the enforcement of Sections 162-59 and 162-321 of the Municipal Code of Ordinances. Furthermore, the Court hereby denies the preliminary injunction and dissolves the Temporary Restraining Order as to Sections 162-58, 162-380, 162-609, 162-657, 162-659, 162-660, 162-661, and 162-613 of the Municipal Code of Ordinances.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Rec.

---

[19]Although Plaintiffs spent considerable time at trial criticizing Defendant's process in enacting these ordinances and eliciting feedback from the public, those allegations are irrelevant to this analysis. It is not the place of the judicial branch to delve into the processes of the law-making branches in order to declare what is reasonable or proper; as long as the formal requirements for the enactment of a municipal ordinance have been met, the Court will not further inquire into the legislative process. Our democratic political system affords those unhappy with an administration's methods another means of airing grievances: the ballot box.

Doc. No. 31) is hereby **GRANTED IN PART AND DENIED IN PART**, as set forth above.

New Orleans, Louisiana, this 20th day of August, 2012.

_____
UNITED STATES DISTRICT JUDGE